IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 21-cv-00281-PAB-STV

EP RESORTS, INC.,
ML PROPERTIES LLC, and
M-SQUARED PROPERTIES, LLC,

    Plaintiffs,

v.

TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA,

    Defendant.

---

## ORDER

---

This matter comes before the Court on Plaintiffs' Motion Pursuant to F.R.E. 702 to Exclude Expert Testimony of Paul L. DeBoer [Docket No. 59] and Defendant Travelers' FRE 702 Motion to Exclude Expert Testimony of Lauren Long [Docket No. 63].

### I. BACKGROUND

This conflict arises out of a fire that destroyed Mary's Lake Lodge ("the Lodge") in Estes Park, Colorado on June 23, 2018. Docket No. 59 at 2. Plaintiff EP Resorts, Inc. ("EP") operated a restaurant and lounge at the Lodge, specializing in hosting wedding events and banquets. *Id.* at 1. EP required wedding clients to pay for the estimated costs of the event in the form of a deposit and two subsequent payments. *Id.* at 1-2. The contracts between EP and the wedding clients provided that 50% of the initial deposit would be refunded if a notice of cancellation was received 9 months before the

event, but that no refunds would be issued after that date.  *Id.* at 2.  However, the contracts also included a clause stating that full refunds would be issued if the Lodge was closed due to an Act of God or War.  *Id.*  After the fire, EP was unable to use the Lodge for its business and was forced to cancel previously scheduled events.  *Id.*  EP refunded the deposits and progress payments received under upcoming wedding contracts.  *Id.*

At the time of the fire, plaintiffs[1] were the named insureds of a business insurance policy ("Policy") issued by defendant Travelers Property Casualty Company of America ("Travelers").  *Id.*  The Policy included coverage for lost business income from the date of the fire to one year later.  Docket No. 63 at 5.  Both Rule 702 motions focus on how EP's lost business income should be calculated.  *See generally* Docket Nos. 59, 63.  EP argues that the deposits for wedding events, including deposits for events that were scheduled to take place more than 12 months after the fire, should be included when calculating its lost business income.  Docket No. 59 at 3-4.  Travelers argues that the deposits for events that would have taken place more then 12 months after the fire were not covered by the policy and should be excluded from the calculation of EP's lost business income.[2]  Docket No. 63 at 5.

Each side endorsed an expert who has calculated EP's business income losses. Plaintiffs have endorsed Lauren Long, a Certified Public Accountant, who will testify that

---

[1] At the time of the fire, M-Squared Properties, LLC was the rental property manager for the Mary's Lake Lodge Hotel Condominiums, which included the Lodge.  Docket No. 45 at 3-4, ¶¶ 3-5.  ML Properties LLC owns units within the Mary's Lake Lodge Hotel Condominiums.  *Id.* at 4, ¶ 6.
[2] The parties only challenge the expert testimony as it applies to the calculation of EP's business income.  *See* Docket Nos. 59, 63.

EP used the "cash method of accounting," claiming deposits as income in the year the deposits were received and refunds as expenditures in the year they were made. *See* Docket No. 69-1 (Ms. Long's Report). Using this method of accounting, deposits received before the fire for events scheduled to take place more than 12 months after the fire should be included in the calculation of plaintiffs' lost business income. Docket No. 66 at 4-6. Travelers has retained Paul. L. DeBoer, a Certified Public Accountant, who will testify that deposits received before the fire for events that would take place more than 12 months after the fire should not be included in the calculation of lost business income based on the accrual method of accounting. Docket No. 65 at 7.

## II. LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. As the rule makes clear, while required, it is not sufficient that an expert be qualified based upon knowledge, skill, experience, training, or education to give opinions in a particular subject area. The expert's proffered opinions must also be reliable. *See 103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006); Fed. R. Evid. 702 (requiring that the testimony be "based on sufficient facts or data," be the "product of reliable principles and methods," and reflect a reliable application of "the principles and methods to the facts of the case"). No party has challenged Mr.

DeBoer's or Ms. Long's testimony on the basis of their qualifications or the reliability of their methods.

Assuming the expert is qualified and the opinions are reliable, the Court must also ensure that the proffered testimony will assist the trier of fact. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999); *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122-23 (10th Cir. 2006). "Relevant expert testimony must logically advance[ ] a material aspect of the case and be sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011) (quotations and citations omitted). In assessing whether expert testimony will assist the trier of fact, a court should also consider "whether the testimony 'is within the juror's common knowledge and experience,' and 'whether it will usurp the juror's role of evaluating a witness's credibility.'" *Id.* at 476–77 (quoting *Rodriguez-Felix*, 450 F.3d at 1123).

### III. ANALYSIS

#### A. Opinions of Lauren Long

Travelers seeks to exclude three opinions by Ms. Long: (1) the policy requires lost business income to be determined using the same method of accounting as the insured; (2) EP earned income at the time it received an advance deposit for an event rather than at the time the event was held; and (3) EP lost business income consisting of the advance deposits that EP received from customers for events to be held after June 23, 2019. Docket No. 63 at 15.

> ***Opinion 1: The insurance policy requires lost business income to be determined using the same method of accounting as the insured.***

4

In her expert report, Ms. Long states, "[p]ages 31 and 32 of the Travelers Insurance Policy say that lost profit is to be determined using the basis of accounting that is used on the company's books and records."  Docket No. 63-1 at 9.  Travelers argues that this opinion "must be excluded because it is an opinion of law that goes beyond permissible expert testimony."  Docket No. 63 at 10-11.  Plaintiffs respond that, "as an expert in the field of accounting, it is within the role of [Ms.] Long to provide her opinion about the method of accounting used by EP and to provide her opinion about the business losses suffered by EP for which Travelers must provide coverage."  Docket No. 66 at 11.

"The interpretation of an insurance contract is a question of law."  *USAA Cas. Ins. Co. v. Anglum,* 119 P.3d 1058, 1059 (Colo. 2005).[3]  For this reason, expert opinions interpreting an insurance policy "invade the province of the Court and the jury." *Girard Offices, LLC v. American Zurich Insurance Company*, No. 19-cv-03590-PAB-MEH, 2022 WL 4467240, at *6 (D. Colo. Sep. 26, 2022).  When Ms. Long wrote in her report that "[p]ages 32 and 32 of [the Policy] say that lost profit is to be determined using the basis of accounting that is used on the company's books and records," she is interpreting language in the policy to require the use of the cash method to determine business income.  Docket No. 63-1 at 9.  In so doing, she invades the province of the Court.  Accordingly, Ms. Long's opinion that the policy requires use of the same method of accounting as the insured used will be excluded.  However, Ms. Long may describe

---

[3] The parties appear to agree that Colorado law applies to the breach of contract claim in this case.  The Court will operate under the same premise.  *Cf. Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

EP's historical accounting methods, may explain her calculation of EP's damages using the cash method, and may offer her opinion as to the appropriateness of using the cash method so long as she does not support these opinions through her interpretation of the Policy language.

Ms. Long would be permitted to testify that the Policy language requires the insurer to calculate lost business income using the insured's accounting method if the Court interpreted the Policy that way. And, in fact, plaintiffs ask the Court to do so. Plaintiffs argue that "[t]he Policy is clear that in calculating losses that such a calculation should consider '[The insured's] financial records and accounting procedures.'" Docket No. 66 at 11. However, courts construing business interruption policies have held that, while the insured's accounting practices are relevant when determining the recoverable loss, they are not controlling. *See, e.g., Am. All. Ins. Co. v. Keleket X-Ray Corp.*, 248 F.2d 920, 928 (6th Cir. 1957) ("the finder of fact is not finally bound by the accounting records of the insured when making a determination of loss under a policy") (applying Ohio law); *Fidelity-Phenix Fire Ins. Co. of New York v. Benedict Coal Corp.*, 64 F.2d 347, 352 (4th Cir. 1933) ("We think it clear that such losses are to be determined in a practical way, having regard to the experience of the business before the fire and its probable experience thereafter, without being confined to the basis upon which books are kept for income tax purposes or for dealings with stockholders.") (citations omitted) (applying Virginia law); *Cohen Furniture Co. v. St. Paul Ins. Co. of Illinois*, 573 N.E.2d 851, 856 (Ill. App. Ct. 1991) ("[L]oss is to be determined in a practical way without confinement to that with which the insured keeps his books for income tax purposes") (citing *Fidelity-Phenix Fire,* 64 F.2d at 352) (applying Illinois law). This was the

approach taken by the court in the case that plaintiffs rely on to support their proposition that the Policy permits application of cash method accounting. *See Gates v. State Auto. Mut. Ins. Co.,* 196 S.W. 3d 761, 766 (Tenn. Ct. App. 2005) ("the insured's books and accounting practices are not controlling in determining the recoverable loss . . . although, by the same token, they are not irrelevant and should be given such weight as practical judgment dictates.") (quoting William Danne, Jr., Annotation, *Business Interruption Insurance*, 37 A.L.R. 5th 41, § 32(e) (1996)) (applying Tennessee law).

Section 5 of the Policy states:

> **5. Loss Payment – Business Income and Extra Expense**
> a. The amount of Business Income loss will be determined based on:
> (1) The Net Income of the business before the direct physical loss or damage occurred;
> (2) The likely Net Income of the business if no physical loss or damage occurred, but not including any likely increase in Net Income attributable to an increase in the volume of business as a result of favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;
> (3) The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and
> (4) Other relevant sources of information, including:
> (a) Your financial records and accounting procedures;
> (b) Bills, invoices and other vouchers; and
> (c) Deeds, liens or contracts.

Docket No. 63-4 at 4-5. Nothing in section 5.a of the Policy states that the amount of Business Income loss must be determined using the insured's method of accounting. *Id.* Section 5.a.(4) simply states that the loss will be determined based on "[o]ther relevant sources of information," without limiting what sources may be considered, and provides that the policyholder's "financial records and accounting procedures" may be used as one of those sources. *Id*. at 5. The fact that the calculation of loss includes the

7

policyholder's accounting procedures appears to be a historical matter, i.e., how the policyholder accounted for business income in the past. But as the courts noted above have held, such language does not require that the policyholder's past practices be used to determine the amount of lost business income under the Policy. Accordingly, the Court concludes that the Policy does not require Travelers to calculate EP's business losses using the same method of accounting that EP used to manage its books.

### *Opinion 2: EP earned income at the time it received an advance deposit for an event rather than at the time the event was held.*

In her deposition, Ms. Long was asked whether her projection of lost business income included income that would be attributable to events that would have occurred more than 12 months after the fire. Docket No. 63-9 at 20, 130:13-18. Ms. Long responded that "it doesn't matter if the event was after 12 months if the money was earned during that 12-month period." *Id.* at 21, 131:17-19. When she was presented with a hypothetical in which EP received a deposit before the fire for an event that was to take place more than 12 months after the fire, she agreed that EP had "earn[ed] that revenue" when it received the deposit. *Id.* at 22, 132:13-20.

Travelers seeks to exclude this opinion on the basis that "EP did not 'earn' money when it booked the contracts for weddings and other events; under the [] approach to accounting contemplated by the Travelers policy, EP only 'earned' the money when those events were actually held."[4] Docket No. 63 at 13-14. Travelers

---

[4] Travelers refers to this categorization of deposits as the "cash approach" to accounting, but the statement that the money is only earned when the events were held is consistent with the "accrual approach" to accounting. Docket No. 63 at 13-14; *see Mid-Del Therapeutic Center, Inc. v. C.I.R.,* 30 F. App'x 889, 891 n.1 (10th Cir. 2002)

references section 3.a.(1) of the Policy, which defines "Business Income."  *Id.* at 11.

That section of the policy states:

>   (1) Business Income means:
>      (a) Net Income (Net Profit or Loss before income taxes) that would
>      have been earned or incurred, including:
>         (i) "Rental Value"; and
>         (ii) "Maintenance Fees", if you are a condominium
>         association; and
>      (b) Continuing normal operating expenses incurred, including
>      payroll.

Docket No. 63-3 at 44.  However, Travelers offers no support for the premise that the word "earned" should be interpreted this way.  Travelers cites *Bernstein Liebhard LLP v. Sentinel Ins. Co.*, 78 N.Y.S.3d 339 (N.Y. App. Div. 2018) (applying New York law), but in that case the parties agreed that "earned" means "become entitled to."  *Id.* at 339.  Accordingly, *Bernstein* offers no guidance as to how a court should interpret "earned" when the insurer and insured disagree as to its meaning.

Travelers urges the Court to adopt the proposition that income "is not 'earned' until the services for which the income has been received have been performed."  Docket No. 63 at 13.  Travelers is essentially arguing that the Policy language should be interpreted to require the use of the accrual method of accounting to calculate the loss of Business Income.  Under that accounting method, "income and deductions are included in the taxable year when [ ] all of the events have occurred that fix the right to receive income."  *Mid-Del Therapeutic* Center, 30 F. App'x at 891 n.1 (citation omitted).

---

(unpublished) ("Under the accrual method, income and deductions are included in the taxable year when [] all of the events have occurred that fix the right to receive income.") (citing Jacob Mertens, Jr., 2 Mertens Law of Federal Income Taxation § 12A (2001)).  The Court therefore interprets this statement as indicating Travelers' opposition to Ms. Long's use of "cash accounting," which categorizes money as earned income in the year it was received. Docket No. 63 at 13-14.

As discussed above, the Policy does not require the use of a certain method of accounting to determine the amount of lost Business Income.  The Court declines to hold that advance deposits and payments for events that were not scheduled to take place until more than 12 months after the fire may not be included in EP's business income under the Policy.

Accordingly, Ms. Long may testify that, in her opinion, EP earned income at the time EP received an advance deposit for an event rather than at the time the event was held so long as she refrains from interpreting the Policy language when doing so.

> ***Opinion 3: EP lost business income consisting of the advance deposits that EP received from customers for events to be held after June 23, 2019.***

In her report, Ms. Long explains that one reason her calculation of EP's Business Income losses differs from Mr. DeBoer's is that, unlike Mr. DeBoer, she included the advance deposits for events that would take place after the fire.  Docket No. 63-1 at 6.  Travelers objects to this opinion for the same reasons as it objects to Opinion 2.  Travelers argues that this opinion should be excluded because it is based on a method of accounting that is "not the method of accounting contemplated by the Travelers policy" and because the deposits should not be included as Business Income under the Policy.[5]  Docket No. 63 at 14.  As described above, the Policy does not require the use

---

[5] Travelers asserts that Ms. Long's opinion is based on the accrual method of accounting.  Docket No. 63 at 14-15.  Ms. Long, however, applied the cash method of accounting.  Docket No. 66 at 10.  Nevertheless, Travelers objects to this opinion on the basis that advance deposits should not be considered lost business income.  The Court interprets Travelers' objection as a further objection to Ms. Long's use of the cash method of accounting.

of either cash or accrual accounting to determine the amount of lost Business Income. Accordingly, this opinion will not be excluded.

### B. Opinions of Paul L. DeBoer

Plaintiffs seek to exclude two opinions of Travelers' expert Paul L. DeBoer on the basis that they are based on improper interpretations of the Policy: (1) the proper method of accounting to be applied in this matter is the accrual method; and (2) the wedding contracts must be interpreted such that the deposits and secondary payments are not income until the wedding events are held because those monies are refundable. Docket No. 59 at 7.

### Opinion 1: The insurance policy is to be interpreted so that the accrual method is to be applied in calculating plaintiffs' lost income.

In his expert report, Mr. DeBoer states that he applied "accrual accounting, which we believe is the proper accounting method in which to measure a business income loss." Docket No. 59-9 at 4. In addition, Mr. DeBoer's report states that "the definition provided in the policy language . . . [is] consistent with the concept of accrual basis accounting." *Id.* at 5. Plaintiffs argue "Mr. DeBoer has further invaded the Court's domain by opining that the Policy is to be interpreted so that the proper method of accounting to be applied in this matter is the accrual method." Docket No. 59 at 7-8. As noted earlier, expert opinions interpreting an insurance policy "invade the province of the Court and the jury." *Girard*, 2022 WL 4467240, at *6. Additionally, the Policy does not require the use of a particular method of accounting when calculating business income. For these reasons, Mr. DeBoer's testimony will be excluded to the extent that he expresses an opinion that the Policy language requires a particular method of accounting. However, Mr. DeBoer will be permitted to testify as to his experience using

11

the accrual method of accounting and the reason he chose to apply it to EP's business records, so long as he does not suggest that the Policy language required him to use that accounting method.

> ***Opinion 2: The wedding contracts must be interpreted such that the deposits and secondary payments are not income until the wedding events are held.***

During his deposition, Mr. DeBoer was shown a sample wedding contract. Docket No. 59-6 at 13, 41:12-42:2. Mr. DeBoer was asked, "[w]hat role did the fact that these deposits would not be refundable play in your analysis?" *Id.* at 43:21-22. Mr. DeBoer responded, "[w]ell, they were refundable because of the nature of [the fire] being an Act of God. . . . I don't know if that answers your question. But that's how it played the role. I understand that they were refundable." *Id.* at 43:23-44:2. Mr. DeBoer's report describes his categorization of the deposits. It explains that his calculation of EP's lost Business Income "does not reflect the collection of . . . deposits that are for future events, because those receipts of money do not reflect earned revenue (from an accrual accounting perspective)." Docket No. 59-7 at 4.

Plaintiffs argue that this opinion should be excluded because the Court should interpret the contracts between EP and the customers who paid deposits in anticipation of holding weddings at the Lodge. Docket No. 59 at 7. However, the testimony that the plaintiffs cite, described above, does not interpret the wedding contracts. In each instance, Mr. DeBoer merely describes the way that he categorized the deposits using the accrual method. In his deposition, Mr. DeBoer explains that his analysis of the deposits was based on his understanding that they were refundable. Docket No. 59-6 at 13, 43:23-44:2. Similarly, Mr. DeBoer's report explains that his analysis of the

deposits for events that were set to take place more than 12 months after the fire was based on his application of the accrual accounting method. Neither portion of Mr. DeBoer's testimony identified by the plaintiffs involves Mr. DeBoer "interpreting" the wedding contracts. Accordingly, Mr. DeBoer will be permitted to testify as to his categorization of the deposits for events set to take place more than 12 months after the fire using the accrual method of accounting.

Wherefore, it is

**ORDERED** that Defendant Travelers' FRE 702 Motion to Exclude Expert Testimony of Lauren Long [Docket No. 63] is **GRANTED IN PART** and **DENIED IN PART**. It is further

**ORDERED** that Plaintiffs' Motion Pursuant to F.R.E. 702 to Exclude Expert Testimony of Paul L. DeBoer [Docket No. 59] is **GRANTED IN PART and DENIED IN PART**.

DATED January 25, 2023.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge